IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TOMMY MCCOY, INDIVIDUALLY, | ) | |
| and TOMMY MCCOY, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:20-CV-3062-G |
| VALVOLINE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the defendant Valvoline, LLC ("Valvoline")'s motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Defendant's Motion for Summary Judgment ("Motion for Summary Judgment") (docket entry 21). For the reasons stated below, Valvoline's motion for summary judgment is granted.

## I.  BACKGROUND

### A.  Factual Background

This suit arises out of a dispute between Tommy McCoy ("McCoy") and Tommy McCoy, Inc. ("McCoy Inc.") (collectively, "the plaintiffs") and Valvoline regarding Valvoline's decision to terminate two contracts with McCoy Inc. on August

27, 2020.  *See* Brief in Support of Motion for Summary Judgment ("Brief in Support of Motion") (docket entry 22) at 1-3; Brief in Support of Response to Motion for Summary Judgment ("Brief in Support of Response") (docket entry 35) at 6. McCoy, a resident of Kaufman, Texas, is the sole owner and operator of McCoy Inc., a Texas company with its principal place of business in Kaufman County, Texas.  *See* Brief in Support of Motion at 4; Brief in Support of Response at 1; Notice of Removal (docket entry 1) ¶¶ 10-12.  Valvoline is a limited liability company whose sole member, Valvoline US LLC, is a Delaware limited liability company, whose sole member, in turn, is Valvoline, Inc., a company incorporated in Kentucky with its principal place of business in Lexington, Kentucky.  *See* Notice of Removal ¶¶ 13-15. Accordingly, Valvoline is, for purposes of this diversity case, a citizen of Kentucky.

McCoy, a veteran of the United States Navy, *see* Brief in Support of Response at 4, formed McCoy Inc. in approximately 2005 after previously owning and operating an automobile body shop with locations in Dallas, Texas, and Mesquite, Texas.  *See* Brief in Support of Motion at 4.  At that time, Valvoline had a preexisting licensing agreement with Dean Boyd ("Boyd"), an individual who owned and operated an automobile body shop in Kaufman called Eagle Oil and Lube.  See *id.* Under the preexisting licensing agreement with Valvoline, Boyd was permitted to use Valvoline's trademarks as part of the sale of Valvoline products and services at Eagle Oil and Lube.  See *id.*  In 2006, McCoy Inc. assumed Boyd's preexisting licensing

agreement with Valvoline and began operating an automobile body shop entitled Eagle Quick Lube from the same location at which Eagle Oil and Lube had conducted its business.  See *id.*

McCoy Inc. continued to operate by the terms of the preexisting licensing agreement until 2010, at which point McCoy Inc. and Valvoline entered into a new licensing agreement ("2010 Agreement").  *Id.* at 5; *see* Appendix in Support of Defendant's Motion for Summary Judgment ("Appendix in Support of Motion") (docket entry 24) at 51-57.  McCoy individually was not a party to the 2010 Agreement.  *See* Appendix in Support of Motion at 57.  Under the terms of the 2010 Agreement, McCoy Inc. was obligated to purchase products (*e.g.*, bulk motor oil, air filters) from Valvoline that McCoy Inc. could then use in its sales of products and services at Eagle Quick Lube.  See *id.* at 51-52.  These Valvoline products were assigned adjustable "Valvoline product point" amounts, and McCoy Inc. was required to purchase a total of 1,000,000 Valvoline product points over the term of the 2010 Agreement.  *Id.* at 51.  In return, McCoy Inc. was granted a license to use Valvoline's trademarks in relation to McCoy Inc.'s sale of Valvoline products.  See *id.* at 51-52.

McCoy Inc. and Valvoline proceeded to operate under the terms of the 2010 Agreement until January 1, 2017, when the parties entered into the two contracts that governed their relationship at the time of the dispute that gave rise to this suit: an Express Care Sales Agreement ("2017 Sales Agreement"), *see* Appendix in Support

- 3 -

of Motion, Express Care Sales Agreement Dated 1/1/2017 ("2017 Sales Agreement")
at 68-91, and an Express Care Performance Agreement ("2017 Performance
Agreement") (collectively, the "2017 Agreements").  *See* Appendix in Support of
Motion, Express Care Performance Agreement Dated 1/1/2017 ("2017 Performance
Agreement") at 93-95; Brief in Support of Motion at 6.  While differences exist
between the 2017 Sales Agreement and 2017 Performance Agreement, the two
agreements address many of the same issues, *compare* Appendix in Support of Motion,
2017 Sales Agreement at 68-69 (discussing McCoy Inc.'s obligations to purchase
various products from Valvoline), *with* Appendix in Support of Motion, 2017
Performance Agreement at 93 (same), and both contracts reflect the fact that McCoy
individually was not a party to the agreements.  *See* Appendix in Support of Motion,
2017 Sales Agreement at 68; Appendix in Support of Motion, 2017 Performance
Agreement at 93.  Similarly, many of the terms of the 2017 Agreements, and in
particular the 2017 Sales Agreement, mirror the terms of the 2010 Agreement.  For
instance, McCoy Inc. remained obligated under the 2017 Sales Agreement to buy
different products from Valvoline and, through these product purchases, obtain a
total of 1,000,000 product points over the course of the contract's term.  *See*
Appendix in Support of Motion, 2017 Sales Agreement at 68, 70.  In exchange,
Valvoline continued to allow McCoy Inc. to utilize Valvoline's trademarks in the
course of McCoy Inc.'s sales of products and services at Eagle Quick Lube.  See *id.* at

68-69.  Though several differences do exist between the 2010 Agreement and the 2017 Agreements (*e.g.*, the 2017 Sales Agreement included both a total number of required Valvoline product points and a minimum number of product points that McCoy Inc. had to purchase per year (149,329) to "maintain appropriate progress with respect to the Total Point Commitment"), the 2010 and 2017 Agreements are largely the same in substance.  *Id.* at 68; *see* Brief in Support of Motion at 6-7.

There is no dispute that McCoy Inc., both before and after entering the 2017 Agreements, enjoyed a successful business relationship with Valvoline.  *See* Brief in Support of Motion at 7; Brief in Support of Response at 6.  McCoy Inc. usually had 6-10 employees at Eagle Quick Lube, which brought in over $2,600,000 in revenue from fiscal years 2017 to 2020.  *See* Brief in Support of Motion at 7.  As part of this business, and pursuant to the 2017 Agreements, McCoy Inc. had approximately $1,300,000 worth of product purchases from Valvoline from 2017 to 2020.  See *id.*; *see also* Appendix in Support of Motion, Excerpts of Deposition of Tommy McCoy ("McCoy Deposition") at 25-26 (affirming that McCoy Inc. purchased goods and supplies from Valvoline under the 2017 Agreements and made "[r]oughly" $1,300,000 in payments to Valvoline since 2017); Appendix in Support of Motion, Plaintiff's Responses to Defendant's First Set of Interrogatories ("McCoy Interrogatories") at 135 (stating, in response to a question regarding the "total amount of payments made by you to Valvoline from 2017 to the present[,]" that

- 5 -

"Plaintiff estimates $1,300,000.").  Moreover, no evidence suggests that Valvoline raised any issues regarding McCoy Inc.'s performance under the 2010 or 2017 Agreements with McCoy or McCoy Inc. prior to August 2020.  *See* Brief in Support of Response at 6; *see also* Amended Appendix in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment ("Amended Appendix in Support of Response") (docket entry 39) at 176 (confirming that "poor performance" by McCoy Inc. under the 2017 Agreements was not "in play" in the termination of McCoy Inc.'s contracts with Valvoline).

However, in late August 2020, McCoy published a document on his personal Facebook account that contained both text and a picture pertaining to the arrest and death of George Floyd ("Floyd") in Minneapolis, Minnesota.  *See* Brief in Support of Motion at 7-8; Brief in Support of Response at 7.  The picture within this document appeared to show Floyd lying on the ground with a knee on his neck.  *See* Brief in Support of Motion at 8.  In the picture, Floyd's face was colored pink, and at the bottom of the picture was pink text that read, "PINK FLOYD[.]"  *Id.*  Above the picture was a brief sentence that McCoy wrote:  "Ya know it's funny[.]"  *Id.*  The parties dispute the intent behind, and significance of, this Facebook document. Compare *id*. at 8, 10, *with* Brief in Support of Response at 7.  Irrespective of the intended message of the document, McCoy published it on his personal Facebook account, which was set to a 'public' setting that allowed Facebook users that were not

McCoy's 'friends' to view and comment on it.  *See* Appendix in Support of Motion, McCoy Deposition at 30.  After the publication of this document on McCoy's 'public' Facebook account, other social media users took notice of, and began 'commenting' on, it.  *See* Brief in Support of Motion at 9; Appendix in Support of Motion at 101-09.  The majority of these comments were critical of McCoy for publishing the document and, among other things, accused him of racism.  *See* Appendix in Support of Motion at 101-09.  A number of these comments recommended that other social media users no longer do business with McCoy, while several comments additionally named specific businesses and stated that those businesses would no longer seek Eagle Quick Lube's services.  See *id*. at 101, 106.

In addition to commenting on McCoy's Floyd-related Facebook document, social media users also took notice of, and began to upload critical comments about, two other documents that McCoy had published on his personal Facebook account in August 2020.  *See* Brief in Support of Motion at 9-10; Brief in Support of Response at 7-8.  The first of these documents contained a comment, written by McCoy, regarding another document that was uploaded by a different social media user.  *See* Brief in Support of Motion at 10.  This other social media user's document read as follows:  "Leftist women love denigrating white men, but have you noticed that 'Kamala Harris married a white man, Susan Rice married a white man, Ilhan Omar married a white man and AOC dating [sic] a white man.  For such vocal haters of

white men, these CLODS sure do love to indulge.' What gives?" *Id.* In McCoy's

comment, which appeared above this other social media user's document, he wrote,

"Cause [sic] we don't hit them during sex." *Id.* The second document that social

media users took notice of was similar in format to McCoy's Floyd-related document:

it included a picture, which itself contained text, and a comment that McCoy wrote

which appeared above the picture. See *id.* The picture was divided horizontally and

included two smaller pictures. See *id.* The top picture depicted what appeared to be

a view of windows and, at the bottom of the picture of those windows, included text

that read, "FRENCH WINDOWS[.]" *Id.* Meanwhile, the bottom picture

purportedly depicted the interior of an apartment in which the windows and wall of

the apartment were missing and, at the bottom of the picture, had text that read,

"BEIRUT WINDOWS[.]" *Id.* Above these two pictures, McCoy wrote, "Ya know

it's funny[.]" *Id.* As is the case with respect to McCoy's Floyd-related Facebook

document, the parties dispute the intent behind, and significance of, these other two

Facebook documents. Compare *id.* at 9-10, *with* Brief in Support of Response at 7-8.

Included among the comments that social media users published regarding

McCoy's three Facebook documents were comments that 'tagged' Valvoline's social

media accounts. *See* Brief in Support of Motion at 9-10. These comments, which

were published on Facebook, Twitter, and Instagram, criticized Valvoline for its

business relationship with McCoy and, in some instances, urged the company to end

that business relationship.  See *id* at 9; *see also* Appendix in Support of Motion at 125 (summarizing social media activity regarding McCoy's Facebook documents).  Some of these comments further endorsed a boycott of Valvoline.  *See* Appendix in Support of Motion at 125.  In total, approximately nine unique comments that 'tagged' Valvoline were uploaded to social media, while approximately 30 additional comments were published in response to those nine unique comments.  See *id.*  In addition to 'tagging' Valvoline's social media accounts, several of the comments also 'tagged' various news outlets and celebrities' social media accounts.  See *id.*; Brief in Support of Motion at 9.

McCoy voluntarily deleted the Floyd-related document within two days of publishing it on his Facebook account, *see* Brief in Support of Response at 7, before entirely deleting his and McCoy Inc.'s Facebook accounts shortly thereafter. *See* Brief in Support of Motion at 10.  Nonetheless, the comments that 'tagged' Valvoline's social media accounts came to the attention of Valvoline's public relations and marketing team.  See *id.*  In addition to publically responding to those comments via Valvoline's social media accounts, the public relations and marketing team passed along a summary of the comments, as well as McCoy's Facebook documents, to Joe Clayton ("Clayton"), a General Manager at Valvoline who was responsible for the "Valvoline Express Care" program under which McCoy Inc.'s contracts with Valvoline fell.  *See* Brief in Support of Motion at 10; Appendix in

Support of Motion at 43-44, 48, 125. Clayton then spent one day assessing McCoy's three Facebook documents and the summary of the comments from other social media users. *See* Brief in Support of Response at 9; Brief in Support of Motion at 11. Upon completing this one day assessment and consulting with several others at Valvoline, including Valvoline's internal counsel, *see* Amended Appendix in Support of Response at 118, 191-92, Clayton decided to terminate the 2017 Agreements with McCoy Inc. *See* Brief in Support of Response at 9; Brief in Support of Motion at 11.

On August 27, 2020, Clayton sent a letter to McCoy terminating the 2017 Agreements between Valvoline and McCoy Inc. *See* Appendix in Support of Response at 127. In the letter, Clayton wrote that McCoy's "recent social media posts containing racist content not only violate Valvoline's values but also damage the Valvoline brand, which cannot be cured by [McCoy]." *Id.* Clayton then wrote that the letter served as an "immediate termination" of the 2017 Agreements, and that this termination was being effectuated "pursuant to [McCoy's] breaches of Section 16(A)(4) of the Express Care Sales Agreement and Section 4 of the Express Care Performance Agreement." *Id.*

Section 16(A) of the 2017 Sales Agreement provides that Valvoline can "automatically terminate" the agreement "upon delivery of Valvoline's written notice of termination to Buyer (without . . . opportunity to cure) if Buyer (or any of its owners)" triggers certain conditions. Appendix in Support of Motion, 2017 Sales

- 10 -

Agreement at 77.  Section 16(A)(4) further provides that one of those conditions is the "Buyer" engaging "in any conduct which adversely affects the reputation of Valvoline or the goodwill associated with the MARKS [*i.e.*, Valvoline trademarks, service marks, and trade dress] (including, but not limited to, child abuse, health or safety hazards, drug or alcohol problems or permitting unlawful activities on the Premises)[.]"  *Id.*  In contrast, Section 4 of the 2017 Performance Agreement states that the "CUSTOMER shall use its best efforts to maintain the quality, good name and reputation of VALVOLINE and the Products," and that Valvoline "shall have the right at any time to change or discontinue use of any trademark, service mark, grade designation, trade dress, trade name or other indication of source of origin . . . under which the Products are sold."  Appendix in Support of Motion, 2017 Performance Agreement at 93.

## B.  Procedural Background

The plaintiffs initiated this action on September 8, 2020 by filing their original petition and request for disclosure in a Texas state court in Kaufman County.  *See* Notice of Removal ¶ 1; Original Petition and Request for Disclosure ("Original Petition"), *attached to* Notice of Removal as Exhibit 1.  In their original petition, the plaintiffs assert various violations of the Texas Deceptive Trade Practices Act ("DTPA").  *See generally* Original Petition.  Valvoline filed its notice of removal on October 6, 2020.  *See* Notice of Removal.

- 11 -

Valvoline filed its motion for summary judgment on June 1, 2021.  *See* Motion for Summary Judgment.  Thereafter, the plaintiffs filed a motion for leave to file their first amended complaint on June 18, 2021.  *See* Motion for Leave to File First Amended Complaint (docket entry 27).  Valvoline filed its response to the plaintiffs' motion for leave to file their first amended complaint on June 24, 2021.  *See* Response to Motion for Leave to File First Amended Complaint (docket entry 30).  The plaintiffs filed their reply in support of their motion for leave to file their first amended complaint on June 29, 2021.  *See* Reply in Support of Motion for Leave to File First Amended Complaint (docket entry 32).  The court denied the plaintiffs' motion for leave to file their first amended complaint on July 2, 2021, thereby leaving the plaintiffs' original petition as the operative complaint in this case.  *See* Order Denying Motion for Leave to File First Amended Complaint (docket entry 33).

The plaintiffs then filed their response to Valvoline's motion for summary judgment on July 6, 2021.  *See* Response to Motion for Summary Judgment (docket entry 34).  Valvoline filed its reply in support of its motion for summary judgment on July 20, 2021.  *See* Reply in Support of Motion for Summary Judgment ("Reply in Support of Motion") (docket entry 40).  Valvoline's motion for summary judgment is therefore fully briefed and ripe for determination.

## II. ANALYSIS

### A. Summary Judgment Legal Standard

Summary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c)(1).[1]  A fact is material if the governing substantive law identifies it as having the potential to affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham.").  To demonstrate a genuine issue as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).  The nonmoving party must show that the evidence is sufficient to support the resolution of the material factual issues in its favor. *Anderson*, 477 U.S. at 249 (citing *First National*

---

[1]     Disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir. 1986).

*Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288-89 (1968)).

When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)).  However, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact.  See *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).  The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986).  "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."  *Malacara*, 353 F.3d at 405.

## B.  Applicable Substantive Law

Federal district courts sitting in diversity apply state substantive law.  *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  Furthermore, while none of the parties raise choice-of-law arguments in their briefs, the court notes that the 2017 Agreements contain choice-of-law provisions that state that the contracts are to be "governed" by Kentucky law.  Appendix in Support of Motion, 2017 Sales Agreement at 80 ("The validity, interpretation and performance of this Agreement shall be governed by the laws of the Commonwealth of Kentucky without regard to conflict of

- 14 -

law principles."); Appendix in Support of Motion, 2017 Performance Agreement at

95 ("THE TERMS AND PROVISIONS OF THIS AGREEMENT SHALL BE

GOVERNED BY THE LAWS OF THE COMMONWEALTH OF KENTUCKY

WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.").  In

accordance with Fifth Circuit precedent, the court interprets these provisions

narrowly and finds that they do not apply to the plaintiffs' DTPA claims or the

arguments made in Valvoline's motion for summary judgment.  See *Smith v. EMC

Corp.*, 393 F.3d 590, 597 (5th Cir. 2004) ("The state's law specified by the choice-of-

law clause is applied only to those claims pertaining to the instrument.  All other

claims are governed by the forum state's law.") (citing *Thompson & Wallace of

Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 433 (5th Cir.1996); *Caton v. Leach

Corp.*, 896 F.2d 939, 943 (5th Cir.1990)); see also *Rogers v. Standard Eco, LLC*, No.

3:20-CV-00216, 2020 WL 6392432 at *2 (S.D. Tex. Nov. 2, 2020) ("Because the

choice-of-law provision at issue here is specifically limited to interpreting the terms of

the written agreement under Arizona law, the provision does nothing to limit

Rogers's ability to pursue the statutory claims raised in this lawsuit . . .  Rogers is

thus free to proceed with a DTPA action.") (citations omitted); *Hoisting Wire Rope &

Sling, LLC v. Accu-Tech Computer Services.*, No. 2:16-CV-61, 2017 WL 6816502 at *3

(S.D. Tex. Dec. 15, 2017) ("Plaintiff's . . . statutory claim of violations of the

DTPA[] [is] separate from the parties' agreement and its interpretation"), *rec. adopted*,

No. 2:16-CV-00061, 2018 WL 309774 (S.D. Tex. Jan. 5, 2018).

## C. Application

Valvoline primarily makes six arguments in its motion for summary judgment: (1) McCoy does not have standing to bring any DTPA claims because he does not fall within the Act's definition of a "consumer"; (2) the plaintiffs' claims are exempted from the DTPA because the value of the underlying contracts exceeds $500,000; (3) the DTPA does not apply to the plaintiffs' claims because those claims are based on the termination of the 2017 Agreements, rather than a fault with the goods or services provided by Valvoline pursuant to the agreements; (4) the plaintiffs' claims amount to breach of contract claims, which cannot be framed as DTPA claims; (5) the plaintiffs lack evidence to substantiate their DTPA "laundry list" claims; and (6) the plaintiffs lack evidence to substantiate their allegation that Valvoline engaged in "unconscionable conduct" under the DTPA.  *See* Brief in Support of Motion at 1-3, 18-19.  Because all of the plaintiffs' claims are based on the DTPA, were the court to agree with Valvoline's second, third, or fourth arguments, the court would grant Valvoline's motion for summary judgment and dismiss all claims against it.[2]

---

[2]     In their response, the plaintiffs attempt to argue that McCoy's Facebook documents constituted "protected speech under the First Amendment to the U.S. Constitution," and that, as such, Valvoline's "use of this protected speech as the sole basis for contract termination was unconstitutional."  Brief in Support of Response at 24, 26 (citing *Snyder v. Phelps*, 562 U.S. 443, 444 (2011)).  Neither this argument nor any constitutional claim appear within the plaintiffs' operative complaint.  *See* Original Petition at 2-12; *see also* Notice of Removal ¶ 3 ("In this suit, Plaintiffs assert

Therefore, before potentially turning to the merits of Valvoline's other contentions, the court considers Valvoline's second argument, that the plaintiffs cannot advance DTPA claims against it because the underlying transactions to which the plaintiffs' claims relate are worth more than $500,000.  See *id.* at 13-16.

First, Valvoline argues that all of the plaintiffs' claims against Valvoline are exempted from the DTPA by subsection (g) of section 17.49 of the Texas Business and Commerce Code, and should be dismissed, in light of McCoy's admissions that McCoy Inc. paid approximately $1,300,000 to Valvoline under the 2017 Agreements.  *See* Brief in Support of Motion at 12-13.  Second, Valvoline, citing several federal and state court cases, argues that contracts that "do[] not state a face dollar amount" but "contemplate[] a transaction which will in the future involve consideration of more than $500,000" fall within the § 17.49(g) exemption to the DTPA, and that, as a result, the "sales transaction here falls squarely within the $500,000 exemption."  *Id.* at 13-14.

In response, the plaintiffs first argue that Valvoline "impermissibly 'totals' all of McCoy's purchases of product from Valvoline" to invoke the § 17.49(g)

---

that Defendant violated various provisions of the Texas Deceptive Trade Practices Act.").  Consequently, the court declines to consider the plaintiffs' constitutional argument.  See *Cutrera v. Board of Supervisors of Louisiana State University*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.") (citing *Fisher v. Metropolitan Life Insurance Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)).

exemption, and that the correct statutory interpretation only applies the exemption to "'a' transaction or 'a' set of transactions to the 'same project' which exceed $500,000." Brief in Support of Response at 14. Second, the plaintiffs aver that Valvoline's own purchasing documents, as well as the 2017 Sales Agreement, treat individual invoices from McCoy Inc. as "single" and "separate" sales. *Id.* Third, the plaintiffs maintain that "not one of McCoy or [McCoy Inc.'s] purchases of product ever exceeded $500,000." *Id.* Fourth, the plaintiffs argue that the precedent cited by Valvoline is distinguishable from the present suit. See *id.* at 14-16.

In reply, Valvoline first avers that the plaintiffs "do not dispute that the total consideration of the underlying contracts well exceeds $500,000." Reply in Support of Motion at 3. Second, Valvoline argues that the language of § 17.49(g), unlike other statutory provisions that include "specific language" which directs courts to individually assess transactions, indicates that the § 17.49(g) exemption should be read to "cumulatively" encompass multiple transactions. *Id.* at 4. Third, Valvoline argues that a broader reading of the § 17.49(g) exemption aligns with other courts' interpretations of the DTPA. *Id.* at 4-5. Fourth, and finally, Valvoline argues that McCoy Inc.'s transactions with Valvoline, "as a logical matter . . . should be viewed cumulatively." *Id.* at 5. In support of this argument, Valvoline avers that, "but for" the 2017 Agreements, "McCoy Inc. could not have purchased the products from Valvoline[,]" and, further, that McCoy Inc. "was obligated to buy various products

- 18 -

from Valvoline pursuant to one agreement, which happened to span multiple years."

*Id.*

Having carefully reviewed the parties' arguments, as well as the evidence cited therein, the court concludes that the plaintiffs' claims against Valvoline are exempted from the DTPA by § 17.49(g).  Because all of the plaintiffs' claims against Valvoline are predicated on the DTPA and exempted by § 17.49(g), the court further concludes that Valvoline's motion for summary judgment should be granted.

Subsection (g) of section 17.49 of the Texas Business and Commerce Code states:

> Nothing in this subchapter shall apply to a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence.

*Id.*  As multiple courts have observed, the DTPA does not define the terms "project" or "total consideration."  See *SPRAJ Properties LLC v. Regions Bank*, No. 3:13-CV-3472-N, 2015 WL 11120528 at *7 (N.D. Tex. May 12, 2015) (Godbey, J.); *Mullins Square, Inc. v. Source 2 Market, LLC*, No. A-08-CA-777-SS, 2009 WL 10669887 at *3 (W.D. Tex. Dec. 14, 2009).  Courts that have sought to interpret these terms and apply § 17.49(g) have done so considering the purpose of § 17.49(g), which is to "maintain the DTPA as a viable source of relief for consumers in small transactions and to remove litigation over large transactions between businesses from

- 19 -

the scope of the DTPA." *Mullins Square*,  2009 WL 10669887 at *3 (citing *Citizens National Bank v. Allen Rae Investments, Inc.*, 142 S.W.3d 459, 473-74 (Tex. App. – Fort Worth 2004, no pet.)); see also *AES Valves, LLC v. Kobi International, Inc.*, No. 01-18-00081-CV, 2020 WL 1880781 at *5 (Tex. App. – Houston (1st Dist.) Apr. 16, 2020) (citing *Citizens National Bank*, 142 S.W.3d at 473-74, for the same proposition).  In light of this purpose, courts have previously concluded that a "project" under § 17.49(g) is properly defined as a "planned undertaking." *SPRAJ Properties*, 2015 WL 11120528 at *7 (citing *Fidelity Telealarm, L.L.C. v. Silver Resources Inc.*, No. CIV.A. 01-2912, 2004 WL 1047661 at *7 (E.D. Pa. May 7, 2004)). Examples of 'planned undertaking[s]' include "financial services relationship[s]," *id.*, as well as "manufacturing and distribution relationship[s]." *Global International, LLC v. ProBalance, Inc.*, No. 3:15-CV-0677-N, 2016 WL 6646225 at *5 (N.D. Tex. Nov. 9, 2016) (Godbey, J.); see also *Fidelity Telealarm*, 2004 WL 1047661 at *7 (defining "project" under the DTPA and applying it to a "distribution relationship.").  In addition, courts that have considered the application of § 17.49(g) have "broadly construed the large-transactions exemption" and concluded that "sets of transactions relating to the same project should be valued collectively for the purpose of determining whether the exemption applies." *Encon International, Inc. v. Barbour Group, LLC*, No. 11-2137-KGS, 2013 WL 12250908 at *12 (D. Kan. Sept. 27, 2013) (citing *Geodominion Petroleum, Inc. v. Boone Exploration, Inc.*, No. 13-06-00430-CV,

2008 WL 3521966, at *5 (Tex. App. – Corpus Christi 2008); *East Hill Marine, Inc. v. Rinker Boat Co.*, 229 S.W.3d 813, 820 (Tex. App. – Fort Worth 2007, pet. denied); *Citizens National Bank*, 142 S.W.3d at 473; *Space Maker Designs, Inc. v. Weldon F. Stump and Co.*, No. 3:02-CV-0378-H and 3:02-2239-H, 2003 WL 21414726, at *2 (N.D. Tex. June 16, 2003) (Sanders, J.)); see also *Mullins Square*, 2009 WL 10669887 at *3 ("Courts have interpreted the 'total consideration' requirement to encompass the full value of the agreement between the parties, rather than solely the amount in dispute in the litigation.") (citing *Aluchem, Inc. v. Sherwin Alumina, L.P.*, Nos. C-06-183, C-06-210, 2007 WL 1100473 at *6 (S.D. Tex. April 11, 2007); *Texas Motor Coach, L.C. v. Blue Bird Body Co.*, No. 4:05-CV-34, 2005 WL 3132482 (E.D. Tex. Nov. 22, 2005), *rec. adopted*, No. 4:05CV34, 2005 WL 3440638 (E.D. Tex. Dec. 14, 2005)).

In considering the potential application of § 17.49(g) to the plaintiffs' DTPA claims, the court finds the case of *Mullins Square, Inc. v. Source 2 Market, LLC* to be particularly instructive.  2009 WL 10669887 at *3-4.  There, as in this case, the plaintiff "assert[ed] there were no individual transactions . . . over $500,000" and claimed that "[a] series of purchases [could not] be aggregated."  *Id.*  Similarly, the plaintiff in *Mullins Square* argued that its relationship with the defendants was "a series of separate transactions that stood on their own," rather than one "aimed toward a project."  *Id.* at *4 (quotation marks omitted).  And there, as here, no party

disputed the fact that the "total amount" that was paid under the contract in question was "well over a half a million." *Id.*

After considering some of the same case law that the court considers in this case, the court in *Mullins Square* turned to the nature of the relationship between the plaintiff and the defendants. See *id.* (citing *East Hill Marine*, 229 S.W.3d at 815, 820-21). Like McCoy Inc., which substantially relied on Valvoline products and the Valvoline trademark for its business, *see* Brief in Support of Response at 4 ("For over 15 years, [McCoy] has operated the center under contract with Valvoline principally selling 'Valvoline' products and services."), the plaintiff in *Mullins Square* admitted that the defendant "supplied the majority of its products for three years." 2009 WL 10669887 at *4. Unlike the relationship between McCoy Inc. and Valvoline, which was formally manifested in the 2017 Agreements and other contracts, the *Mullins Square* court observed that there "was no written agreement between the parties," and that instead there had been "a dozen or more separate purchase orders" sent between them. *Id.* (quotation marks omitted). Nonetheless, the *Mullins Square* court concluded that the plaintiff was "engaged in the project of selling" products from the defendant, and that, as a result, "[a]ll of the transactions" between the parties "were related to that project." *Id.* Because "the total consideration . . . for the set of transactions [was] well over $500,000," the *Mullins Square* court concluded that "the exemption applies." *Id.* In addition, the *Mullins Square* court concluded that the case

before it involved companies "with an extended history of dealing and a series of

transactions exceeding $1.1 million," and, "[a]s such, it is a perfect example of the

type of case intended to be exempt under § 17.49(g)."  *Id.*

Here, McCoy has admitted during both a deposition and in answers to

interrogatories that McCoy Inc. paid approximately  $1,300,000 to Valvoline under

the 2017 Agreements.  *See* Appendix in Support of Motion, McCoy Deposition at 25-

26; Appendix in Support of Motion, McCoy Interrogatories at 135.  McCoy Inc. paid

this sum to Valvoline to purchase Valvoline products that McCoy Inc. could then

offer in its retail services and sales at Eagle Quick Lube, a "Valvoline Express Care

Center" which had indoor and outdoor signs that included the Valvoline logo and

promoted the Valvoline brand.  Brief in Support of Response at 1; *see* Appendix in

Support of Motion, McCoy Deposition at 13, 21.  McCoy Inc. was contractually

obligated to purchase these Valvoline products by the terms of the 2017 Agreements,

and in exchange for their purchase (and other conditions), McCoy Inc. was granted,

among other things, a license to use Valvoline trademarks at Eagle Quick Lube and a

right to resell Valvoline products to the public.  *See* Brief in Support of Response at 4;

Appendix in Support of Motion, 2017 Sales Agreement at 68, 70.  The 2017

Agreements, in turn, were an extension of the business relationship between McCoy

Inc. and Valvoline that began in 2006.  *See* Brief in Support of Motion at 4.  The

plaintiffs do not dispute these facts, which indicate a shared and "planned

undertaking" involving McCoy Inc.'s purchase of various products from Valvoline that McCoy Inc. could then sell to the general public. *SPRAJ Properties*, 2015 WL 11120528 at *7 (citation omitted). Based on these facts, the court concludes that "a set of transactions relating to the same project" with a "total consideration . . . of more than $500,000" occurred between McCoy Inc. and Valvoline. Texas Business & Commerce Code § 17.49(g); see *Mullins Square*, 2009 WL 10669887 at *4.

The court is unpersuaded by the plaintiffs' arguments as to why the § 17.49(g) exemption should not apply in this case. To begin, the plaintiffs fail to identify, and the court is not aware of, any precedent that would suggest that the parties' own descriptions of their contractual relationship should govern the court's ability to consider one or multiple transactions for § 17.49(g) purposes. It is true that the 2017 Sales Agreement refers to the individual deliveries of Valvoline's products to McCoy Inc. as "separate sale[s]." Appendix in Support of Motion, 2017 Sales Agreement at 70 ("Each delivery hereunder is a separate sale."). However, this fact, which the plaintiffs fail to connect to case law supporting their argument, does not determine whether a "project" occurred between McCoy Inc. and Valvoline. Texas Business & Commerce Code § 17.49(g); see also *Fidelity Telealarm*, 2004 WL 1047661 at *7 ("Silver, as the non-moving party, . . . cites no supporting case law for its argument that no case authority supports Fidelity's definition of a 'project' as encompassing all of the business dealings of a company over several years, therefore

- 24 -

this argument fails.").  Nor does it sway the court's application of the law:  if the parties were able to avoid the application of § 17.49(g) by virtue of their own contractual definitions of various transactions, the exemption's goal of removing large litigation between businesses from the DTPA would be undermined.  See generally *Citizens National Bank*, 142 S.W.3d at 473 (noting a 1995 law review article, written by "Senate and House co-sponsors of the bill" that created § 17.49(g), in which the article's authors discuss § 17.49(g)'s purpose and state that the "reform [bill] has eliminated many high-dollar transactions from the reach of the DTPA.").  The court thus declines to base its application of § 17.49(g) on the parties' own contractual descriptions of their transactions.

In addition, while the plaintiffs argue that application of the § 17.49(g) exemption is not supported by the case law cited by Valvoline, the court concludes that the weight of case law supports the application of § 17.49(g) here.  As is described above, a "project" under § 17.49(g) encompasses "planned undertaking[s]" between parties, *SPRAJ Properties*, 2015 WL 11120528 at *7 (citation omitted), such as "manufacturing and distribution relationship[s]."  *Global International,* 2016 WL 6646225 at *5.  Further, notwithstanding the plaintiffs' attempts to distinguish the case law cited by Valvoline, the court concludes that those cases remain relevant and generally support the application of § 17.49(g) here, where the parties engaged in a "set of transactions relating to the same project" under the 2017 Agreements.  Texas

Business & Commerce Code § 17.49(g); see *Texas Motor Coach*, 2005 WL 3132482 at

*5 (applying the § 17.49(g) exemption after concluding that the parties' "contract

assumed delivery of three M-380 coaches," the "total consideration [of which] would

be in excess of $200,000 each."); *East Hill Marine*, 229 S.W.3d at 820-21 (applying

the § 17.49(g) exemption after concluding that, "[b]ecause East Hill Marine

promised to pay appellees $859,513 and then sued to recover the lost profits on this

amount, East Hill Marine's transactions with appellees exceed the $500,000 limit

imposed by the DTPA.") (citation omitted);[3] *Citizens National Bank*, 142 S.W.3d at

474 (applying the § 17.49(g) exemption to DTPA claims based on a conclusion that

"overall consideration exceeded $500,000 on the Bed & Bath project.").  Finally, the

court observes that other case law supports the application of the § 17.49(g)

exemption here.  See, *e.g.*, *Taylor v. Taser International, Inc.*, No. CV H-17-673, 2019

WL 1434213 at *13 (S.D. Tex. Mar. 29, 2019) ("[T]he purchase of numerous X2s

by HPD pursuant to one contract that far exceeded the $500,000 limit clearly fits

---

[3]       The plaintiffs correctly observe that, in *East Hill Marine, Inc. v. Rinker Boat Co.*, the president of appellant East Hill Marine admitted during a deposition that one transaction between the parties exceeded $500,000 by itself.  229 S.W.3d at 820-21.  However, the *East Hill Marine* court prefaced its observation of this fact by stating that "East Hill Marine's president . . . admitted that East Hill Marine's damages claims against appellees involved *total consideration* of at least $859,513."  *Id.* at 820 (emphasis added).  In addition, the *East Hill Marine* court based its holding on the total consideration of the project between the parties, rather than the value of the abovementioned, individual transaction.  *Id.* at 821.  Therefore, the court does not read *East Hill Marine* to be inconsistent with the application of § 17.49(g) in this case.

- 26 -

within the [§ 17.49(g)] exemption's reach."); *Obermeyer Hydro Accessories, Inc. v. CSI Calendering, Inc.*, No. 14-CV-00184-RM-KMT, 2015 WL 506896 at \*2-4 (D. Colo. Feb. 5, 2015) (assessing multiple "Fabric purchases," each of which was worth less than $500,000, and concluding that they together constituted "a series of transactions . . . which exceed[ed] $500,000[,]" related to the same project, and triggered the § 17.49(g) exemption).

Ultimately, the court does not see any reason to deviate from the sound logic of the *Mullins Square* court. McCoy Inc. and Valvoline have "an extended history of dealing" with each other that dates back to 2006. *Mullins Square*, 2009 WL 10669887 at \*4; *see* Brief in Support of Motion at 4. As part of this "extended history of dealing," McCoy Inc. and Valvoline entered into the 2017 Agreements. *Mullins Square*, 2009 WL 10669887 at \*4; *see* Brief in Support of Motion at 6. Per the 2017 Agreements, McCoy Inc. was contractually obligated to engage in "a series of transactions" and purchase Valvoline products from Valvoline that McCoy Inc. could then sell to the general public. *Mullins Square*, 2009 WL 10669887 at \*4; *see* Brief in Support of Response at 4.[4] This "series of transactions . . . exce[ded] $1.[3]

---

[4]     Unlike the parties in *Mullins Square*, who exchanged "a dozen or more separate purchase orders" without the benefit of a written contract, McCoy Inc. and Valvoline did have "written agreement[s]" in the form of the 2017 Agreements. 2009 WL 10669887 at \*4 (quotation marks omitted); *see* Brief in Support of Motion at 6. This distinction, if anything, supports the application of the *Mullins Square* court's logic to the facts of this case: even more than the parties in *Mullins Square*, McCoy Inc. and Valvoline were clearly participants in a shared undertaking,

million" in value, which is far above the $500,000 "total consideration" limit set by

§ 17.49(g). *Mullins Square*, 2009 WL 10669887 at *4; *see* Appendix in Support of

Motion, McCoy Deposition at 25-26; Appendix in Support of Motion, McCoy

Interrogatories at 135. Therefore, given that this litigation does not involve McCoy's

residence, *see* Texas Business & Commerce Code § 17.49(g), the court concludes that

this case is a prime "example of the type of case intended to be exempt under

§ 17.49(g)" and grants summary judgment in Valvoline's favor.[56] *Mullins Square*,

---

evinced by the 2017 Agreements, which saw McCoy Inc. "engaged in the project of
selling" products from Valvoline. 2009 WL 10669887 at *4 (quotation marks
omitted); *see* Brief in Support of Response at 4.

[5]    Because the court's conclusion disposes of all of the plaintiffs' claims,
the court does not turn to, or decide on, the merits of the other arguments advanced
by Valvoline in its motion for summary judgment.

[6]    Valvoline separately argues that it is entitled to attorneys' fees because
McCoy and McCoy Inc.'s claims are "groundless" under the DTPA. *See* Brief in
Support of Motion at 20-21; Reply in Support of Motion at 10. McCoy and McCoy
Inc. superficially address this argument by averring that there is an "absence of
evidence in the summary judgment record constituting any" of the grounds on which
attorneys' fees could be granted. Brief in Support of Response at 27.

Subsection (c) of section 17.50 of the Texas Business and Commerce Code
provides that courts "*shall* award . . . reasonable and necessary attorneys' fees and
court costs" to defendants upon a "finding by the court that an action under this
section was groundless in fact or law *or* brought in bad faith, *or* brought for the
purpose of harassment." Texas Business & Commerce Code § 17.50(c) (emphasis
added). As this court recently observed, courts interpreting this statutory provision
have "determined that 'whether an action is groundless, brought in bad faith, or
brought for the purpose of harassment is a question to be determined by the trial
court.'" *Arizpe v. Principal Life Insurance Co.*, No. 3:18-CV-1010-G, 2019 WL
4246598 at *2 (N.D. Tex. Sept. 6, 2019) (Fish, J.) (citing *Knoderer v. State Farm
Lloyds*, 515 S.W.3d 21, 45 (Tex. App. – Texarkana 2017, pet. denied); *Donwerth v.*

- 28 -

2009 WL 10669887 at *4.

---

*Preston II Chrysler-Dodge, Inc.*, 775 S.W.2d 634, 637 (Tex. 1989); *Alcan Aluminum Corp. v. BASF Corp.*, 133 F. Supp. 2d 482, 506 (N.D. Tex. 2001) (Lindsay, J.)). Further, "both Texas courts and federal courts interpreting these statutory provisions have determined that '[a] groundless action is defined as one having no basis in law or fact and not warranted by a good faith contention for modification, reversal, or extension of existing law.'" *Id.* (citing *Alcan Aluminum*, 133 F. Supp. 2d at 506). "In particular, courts have established that '[t]he standard for determining whether an action is groundless is whether the totality of the tendered evidence demonstrates an arguable basis in fact and law for the consumer's claim.'" *Id.* (citing *In re Frazin*, No. 02-32351-BJH-13, 2017 WL 7050632, Adversary No. 08-3021-BJH, at *26 (Bankr. N.D. Tex. Dec. 22, 2017) (Houser, Chief Bankruptcy J.)).

Just as this court concluded in *Arizpe v. Principal Life Insurance Co.*, the court here determines that the plaintiffs' "position [is] arguable and thus not groundless and without basis in fact or law." *Id.* at *3. While McCoy and McCoy Inc., unlike the plaintiffs in *Arizpe*, only offer a brief response to Valvoline's argument regarding attorneys' fees, the court notes a declaration by McCoy, contained within the plaintiffs' amended appendices to their response to the motion for summary judgment, that the dollar value of "ten years of reaching the 149,329 [contractually required annual] Points would total roughly $111,996.75." Amended Appendix in Support of Response at 6. This declaration, which the plaintiffs do not cite in their response, could be argued to indicate that the face value of the contracts, when converted from Valvoline "Points" to dollars, is less than the $500,000 limit set by § 17.49(g). *Id.* The plaintiffs fail to make this argument, and the declaration is insufficient to sway the court's conclusion that summary judgment should be granted in Valvoline's favor, given that the 2017 Agreements provide that the value of Valvoline purchase points can fluctuate and, moreover, that McCoy admitted to purchasing approximately $1,300,000 worth of products from Valvoline under the agreements. *See* Appendix in Support of Motion, 2017 Sales Agreement at 68-69; Appendix in Support of Motion, McCoy Deposition at 25-26; Appendix in Support of Motion, McCoy Interrogatories at 135. Nonetheless, this declaration, alongside the plaintiffs' contention that McCoy Inc.'s purchases never individually exceeded $500,000, demonstrates that the plaintiffs' position is, at the very least, "arguable." *Arizpe*, 2019 WL 4246598 at *3. Therefore, the court concludes that McCoy and McCoy Inc.'s claims are not groundless and declines to assess attorneys' fees against them.

III.  CONCLUSION

For the reasons stated above, Valvoline's motion for summary judgment is

**GRANTED**.  Judgment will be entered in favor of Valvoline.

**SO ORDERED**.

October 19, 2021.

_A. Joe Fish_

A. JOE FISH
Senior United States District Judge